The case is Charles Chastain v. Secretary of Veterans Affairs, 2012, 7136. Mr. O'Connell, when you're ready. The fundamental truth at the center of this case is that an error of omission is different from other types of error. It's not an error that the Q doctrine is meant to correct, particularly the omission of a diagnosis in service made by a military physician, particularly in a case where the RO didn't just not comment on that diagnosis, but actually denied its existence. Time and again, the Secretary has argued that this case must fail because you can't have a Q claim that's just based on a re-weighing of the evidence. Well, when you have a diagnosis that was omitted, there was never an original weighing. Time and again, the VA has argued, and the tribunals have all accepted, that you can't hear any evidence about the nature of that diagnosis that was never discussed and was denied, whose existence was actually denied. Didn't the court below decide that it was not outcome-determinative and therefore was not Q? We don't believe that the court ever really weighed the omitted evidence with the non-omitted evidence. They never actually considered that, and we have disagreements about that. Well, you do because you've got basically a fact case, Q, and you want to transform it into a legal case, which, of course, we see commonly. Well, Your Honor, we think that the tribunals below clearly used standards and used rules of law that determined the outcome in this case and determined how they met those facts, and we think we have a right to ask that those rules be clarified and be interpreted properly. One of those rules is that you can't have any sort of comment or any sort of opinion about what that omitted diagnosis actually means, and that's a terrible rule because it essentially means that the determination is going to hinge on whether an omitted diagnosis happens to be a disease that everybody understands. That's not a principled way to make a distinction. This is a case in which clearly the court could have used just the evidence from this affidavit, from this doctor name that we're trying to have the court consider isn't based on a test that was done years after. It's just basic medical information, basic medical opinion about what that diagnosis actually meant. That was all available in 1977, but when the R.O. completely denied that it ever existed, then you don't have the opportunity to – it didn't have enough data to consider that half the time, and we think that a court now should have the opportunity. Let me be sure I have a particular critical issue clear in my mind, and that is shortly before Mr. Chastain's discharge in 1970, there was a medical exam, right? And that medical exam identified that he suffered from two independent injuries. One was spina bifida, which apparently had some earlier origin. And the other was spondylosis. That medical exam clearly identified two separate problems. Was that medical – if I understand the factual background in your argument, you're saying that medical exam was not properly considered by the R.O. in the first filing for benefits. Is that correct? All the courts below can see that, and the VA can see that, that this was omitted. It was never considered, and in fact, the R.O. denied that there was any evidence that showed another injury other than spondylosis. And the later – there was a later Board of Review reversal or action that specifically acknowledged that that had happened. Is that correct? Board of Appeals. Correct. Both the Board below admits that there was an error. Maybe I'm misunderstanding what you're – Yeah. Okay. Correct. So they admit there's an error, and the Secretary admits there is an error. Yeah. My question is, in making their final decision as to the effective date – and that's all that's at issue, I take it – did that exam get ever considered subsequently by an R.O. or whoever needs to consider it? That's the question that's puzzling me. So the Board – the Board says it considered it, but it also announced a number of rules that it used in interpreting that early diagnosis that we think are wrong. Specifically? Specifically, one, we won't hear any evidence about what that diagnosis means. Well, I don't understand that. How could they say that? Well, they said – the principle they're using is that ordinarily for acute claim, you cannot use evidence that wasn't in the record at the time. So you can't put on new evidence to show – But wasn't that in the record – wasn't that in his medical records at the time, that examination? The 1970 – That was in his medical record at the time, but simply wasn't considered. It wasn't considered, and the R.O. denied that it existed. But, in fact, it existed in the medical records. Correct. And the Board said this was an error, and then it was confronted with the question of if it weren't for the error, would there have been a manifestly different result? And they concluded no, and the Court below affirmed that decision. But there were several rules that both the Board and the Court thought they had to use in interpreting and going about that question. One of them would have been different rules. Which was, I take it, that because they didn't see that medical record in 1970, it wasn't in the record. No, no, that's not true. They've accepted that it is part of the record as far as acute analysis. What they're not accepting is that we can't take what a doctor happens to say in 2002 about what this diagnosis means. Again, it's just general medical evidence. And without that, the Board and the Court is a group of laymen or lawyers deciding how this diagnosis fits with the other evidence. And the non-admitted evidence in this case was neutral. There were x-rays that didn't happen to show this other condition. It showed the condition that he had that existed before. And it was in no way an actual contradiction of this positive diagnosis. It was totally admitted and ignored, and it was as if this was denied by the NRO. To not allow a doctor to tell you, okay, here's what this diagnosis means, under a rule that we're not supposed to consider new evidence, is misplaced. Because this isn't new evidence, this isn't a test done in 2000 to try to piggyback or shoestrap you on to a claim, make the 1970 claim look silly. It's evidence about what that diagnosis meant. And again, if you don't allow that evidence, then you're just letting determination hinge on whether people know what that diagnosis means or not. Further, another rule they said was that all evidence has to militate in support of the claim. That's a different sort of queue claim. That's one way you can assert a queue. This is a different sort of case. This is a case where there was an admitted diagnosis. We think that analysis has no application in here, and the Putin court and the Russell court understood that. And we think that the rules analysis and the way they went about it are the right way to go about it. Don't you have to say an admitted possible diagnosis? As I understand the record, there was a question mark by the condition, which I won't try to pronounce. But in one place, another place, it was indicated in, I think, the February 1970 medical examination. So isn't it part of the finding of these lower tribunals that it was a possible condition? Well, there were two actual documents that were accepted. And so one is a clear diagnosis, and the other one has a notation with a question mark that would suggest a possible diagnosis. I just wonder why that alone doesn't allow the result that was reached below. And that is that it cannot be found that there clearly would have been a different result when there was some question about whether the condition existed and to what extent at all. Well, we disagree with how you would read those two documents, the suggested reading. And why isn't that a question of fact, then, which I understand we don't have jurisdiction over? The other evidence, I don't believe the court relied on that argument. And the other evidence doesn't contradict the diagnosis. And I would also say that I think the notation with possible spondylolisis doesn't actually contradict a positive diagnosis. So I don't think it actually contradicts. One other rule that the court used below, the court uses below, is to say that the veteran, in addition to showing that a diagnosis was omitted, now also has to come up with so-called objective clinical evidence on which that diagnosis was based. The court didn't explain what that might be. One can only imagine, perhaps, as he x-ray films, that that diagnosis had relied on, that that doctor had relied on in making that diagnosis. I think this is an extraordinary burden to put on the veteran. It has no basis in the statutes or the regulations, and it has no basis in other court cases. And it's a terrible rule because, again, what would the board have done, what would the court have done, if we did have these x-rays? Would they then be examining the film, or would they ask a doctor to tell you what that film means? That's all we're asking to have done, to have this affidavit of Dr. Nance on it, give some scientific explanation of what that diagnosis meant. Help me be clear on this. The board said, absent such evidence, the board cannot conclude that all evidence at the time of the June 5, 1970, RO decision, was, quote, militated in support of the claim, unquote. Let's not argue with the standard. I understand your argument that that's the wrong standard. But let's assume we're going to apply that standard. As of the June 5, 1970, RO decision, what was the evidence of the record at that time, whether or not the RO considered the evidence of record? What was the evidence of record at the June 5, 1970 decision? The history of being in combat, the history of lifting 90-pound shells for hours a day for many months, a positive diagnosis made by a military doctor while he was in service, a spondylolisis, a diagnosis that had never been made before or prior to that, later, a document mentioning... Not later. 1970. I don't mean later. I mean, at that time, a diagnosis mentioning the possibility of spondylolisis, and then some x-rays that were done at the time he applied for the benefits that didn't happen to show the spondylolisis. And a diagnosis, then, of spina bifida, and the RO saying there are no other... There are no other... There's no evidence of any certain other factors. So let me be sure I understand what the circumstances were. You had one positive diagnosis identifying the spina bifida, the spondylolisis, and then you had a second that identified both of those, although was less clear about the second injury. And that is an x-ray report by an x-ray technician, I believe. And then was there a third one? The other medical documents were essentially some other x-rays a couple of months after that diagnosis. Simply mentioned the spina bifida, but didn't say anything about... Correct. Didn't address that, either. He never addressed it. He never said anything about actually not diagnosing, you know, disproving the diagnosis. Got it. Thank you. Mr. O'Connor, your time is just past five, but we'll give you two minutes for rebuttal. I appreciate it. Thank you. Mr. Austin. Thank you, Your Honor. May it please the Court. Judge Fletcher, if I could start off with responding to your question about what the evidence was in the record. I'd like you to do that. Thank you. Of the period of 1970, there were four pieces of medical evidence in the record. In February of 1970, and this is at pages A38 and A41 of the record, there was a progress note which said, x-rays show questionable spondylolisthesis unilaterally. That was followed up with a primary relied upon, which was a medical exam, where a lumbar examination or physical exam was found to be normal, and there it says spine epiphyta and spondylolisthesis L5, left side. And that's at A37 and A38. Now, there was a request for an ortho consult on page A38 made. The orthopedist, of course, is the specialist in lumbar spine and orthopedic injury. That evaluation was performed by the VA in April 29 and April 30. On April 29, at page A41 of the joint appendix, there's an orthopedic consultation, and the orthopedic consultation says, spine epiphyta L5 and x-ray will evaluate congenital anomalies. The x-ray is done the next day, and that is at page A47. It says in that x-ray, this is a spine epiphyta posterior L5, no other abnormality. So the x-ray was done on the orthopedic consult and said, we have spine epiphyta, we do not have any other abnormality. That is a negative finding. So at this point in the record, you have completely conflicting evidence. You have some evidence which says spondylolisthesis is present, and you have some evidence which says there is no spondylolisthesis. There's nothing present on the x-ray. But Board did the appropriate thing here, Your Honor, and their statement is right above the one you read on page A19. It says, with respect to the latter evidence, referring to this April 1970 evidence, the Board finds that it provides a competent basis for concluding that the veteran did not have a back disorder other than spine epiphyta at the time of the June 5, 1970, RO rating decision. That is a correct evaluation of the evidence, and that is applying the correct standard. But that assumes that whoever did the weighing at the RO 1970 event had all of that in front of them. Isn't that right? And the record indicates that the RO says, I never saw that and didn't consider it. The record that was before the RO and the error, which counsel correctly indicated, both the Board and the Veterans Court found, was that they didn't acknowledge the existence of this evidence. That was the error. So that evidence then never got properly weighed. That's correct. That's correct. What the Board is saying here, using the right standard for CUE, is that, but for the error, let's assume there was no error. Let's assume all this evidence was in front of the RO in 1970. It's not an outcome-determinative error. Why is it not an outcome-determinative error? Because there's some evidence which says there's spondylolisis, for which you could have found there was service connection, and there's some evidence that says there was no service connection because there was no spondylolisis. So we don't know what that RO would have found. Therefore, it's not an outcome-determinative error because there was sufficient evidence before the RO at that time, and all the evidence is considered, that would have supported a finding of no spondylolisis, no service connection. That is application of the outcome-determinative test. Now, counsel's real problem, and he comes out of his brief and says this on pages 28 and 31, and he said it again at his opening statement, is this is a terrible rule, he said. This is an extraordinary burden, and it is. It's a tough burden. That is the law of Q.U.E. What they are conflating is a direct appeal, in which the outcome would have been very different from the situation we have here, which is Q concerning a final decision of the RO in 1970 in very different standards than you have on a direct appeal. The board would have said you made an error and would have remanded to the RO, and the remand is clearly entitled to a remand, and the remand would have said you failed to consider this evidence, you need to weigh this evidence, RO, and come to a conclusion. The RO would then have to weigh the evidence, would have had to consider the reason why. And that was never done. It wasn't done because this is not a direct appeal. That's not the standard in a Q.U.E. situation. Q.U.E. situation, remember, is a final decision. So the law says, unlike the law anywhere else, where this would be raised to the contrary at this point, they're saying we're going to give you another chance, but you have to meet the standards which are described in the regulation at 20.1403 as a specific and rare error. And it's the outcome determinative test which is their problem. Their problem is not that the RO, if he had weighed this evidence, could have come to the conclusion that there was service connection. He could have. He could have, based upon the analysis of the board and the veterans court. The problem they have is that the board and the veterans court, based on factual findings, concluded that the RO could reasonably have also come to the conclusion that there was no service connection, i.e., there was no spondylosis. But should we remand for that determination? No, because it's not an outcome determinative error. Were this a direct appeal? It should, and we can't review that. That's also correct. What would have to have happened to make it an outcome determinative? Well, the board would have had to reach a factual conclusion that no reasonable person, no reasonable fact finder, could have concluded that there was no service connection. And, in fact, if you read the board's analysis very carefully, the board distinguishes the veterans court's decision in Boughton. And in Boughton, that's exactly what happened. In Boughton, the board had concluded there was no CUA, no Q, in an earlier RO decision. The veterans court said, board, you've erred. And the veterans court said that you erred, board, in two respects. First, there was an error because, in Boughton, the RO failed to acknowledge the existence of positive evidence showing service connection. And the veterans court, in our case, in Chastain, said, we're just like Boughton in that respect. Because here, there was an error because the RO failed to consider other evidence. The Boughton court then went forward and said, we now have to consider whether this error was outcome determinative. And the Boughton court concluded, in that case, it was. And the analysis of the Boughton court was that the evidence that the board found in finding no clear and unmistakable error was not evidence that supported the absence of a service connection. Because there was a leap in logic that the board made that the veterans court said was unwarranted. Therefore, the veterans court in Boughton said, there's no evidence that supports the absence of a service connection. What the board did here is distinguish that part of Boughton and said, this is not like Boughton. And this is not like Boughton because there is evidence, in this case, of the absence of a service connection. And therefore, it's not outcome determinative. But if we were convinced, let's use that parallel, if we were convinced that the medical record showing that he had both injuries, clearly stating he had both, then the x-ray thing saying that he clearly has one and may have the other, those are both indicators that he had the second spondylosis. And then the third examination, which never addressed the spondylosis issue, as if it didn't exist. And there is an attempt in the record to explain how that third one could have happened, but the board refused to hear it. If we concluded from all of that that this case is more like Boughton than it is not, then what would we do? Well, first of all, I don't think the court has jurisdiction to do that because it's weighing the evidence, which now, of course, is a Veterans Court decision. The Veterans Court clearly does have that ability to weigh the evidence. We're not weighing it. We're simply saying it was not properly weighed. That is, there's no evidence on which you could have come to the other conclusion. Assuming the board, assuming this court had jurisdiction to address that question, and it came to the conclusion that there was no evidence at all to support the finding of those services. Two pluses and a neutral. Let's say we conclude it's two pluses and a neutral. That would be equivalent to Boughton. Boughton said that would be equivalent to Boughton. Then what do we do? Well, I don't think the court has jurisdiction, but if this were the Veterans Court, you would have to do as the Veterans Court did in Boughton and find that there was CUA because a reasonable person in your honor's hypothetical could not conclude there was an absence of service. So shouldn't we give this back to the Veterans Court with instructions? No, because both the board and the Veterans Court, in this case, review the evidence and make factual findings that this case is not like Boughton and it's not like Boughton because of the April 29 and April 30, 1970 evidence on pages 841 and 847, both of which contain affirmative evidence of the absence of service connections. Specifically, the 847 lumbar x-ray said there's spina bifida posterior, no other abnormality of the spine. It couldn't be more explicit saying we don't see anything else in that same area of the spine other than the spina bifida. That is a finding of no spondylolisis. So here you have factual findings by the fact finders, both the board and the Veterans Court, which concluded that your honor's hypothetical is not the case here. How do you respond to Mr. O'Connell's argument that there was an error of understanding the proper standard and they didn't allow medical evidence to explain the nature of this spondylolisis? Your honor, that goes to another part of the clear and undistinguishable error of acute test that Mr. Chastain does not like. He doesn't like the optimum determinative test. He also doesn't like that requirement, long-standing law of acute. It says you have to rely upon the medical evidence that existed in the record at the time of the oral decision upon which he was being claimed. Well, he argues the 2010 evidence that was excluded was simply to explain why that third medical exam might not have seen the problem of spondylolisis. Your honor. What's wrong with that argument? Because the evidence didn't exist in 1970. That evidence existed in 2003 when Dr. Nance submitted an affidavit. He submitted an affidavit, which frequently medical records have all the time. It says, you know this negative evidence which is showing the absence of spondylolisis? Well, that's a false negative. And false negatives frequently happen in this case. And this evidence that does show spondylolisis, that's a positive. Whenever there's positive evidence, that deserves more weight. That evidence is in the record all the time. But it has to exist for a Q claim in 1970. If Dr. Nance had submitted that affidavit in 1970, it would have to be considered. But that doesn't make a lot of sense if what they're arguing is you have to understand why the evidence in 1970 looked the way it did. You now have an expert explaining that. What's wrong with having an expert come in? We rarely have expert testimony prior to the time that the challenge is made. And the challenge was made later. He brings in his expert testimony. Well, actually you do, because you have examinations that are contemporaneous where a doctor will look at the evidence and say we've got some pro and con. I believe the con evidence more than the pro evidence, and here's why. Well, that could have been the case. Now, what you're saying, Your Honor, is exactly what they argued in their new and material evidence case, which they prevailed on. They came into the court and said, now that we have Dr. Nance's opinion, which says that the 1970 diagnosis of spondylosis was right, and the positive evidence is more important than the negative evidence, we now have a new and material evidence case. And the RO said that's right. And you do, and he granted him 20% of the back effective August of 2001. He had that. But what's important here is even with all that evidence, even with Dr. Nance's affidavit, and even with subsequent diagnosis of questionable spondylosis, even then the RO said the evidence is now in equal place with all this evidence. So now I conclude under the reasonable doubt rule that I'm going to grant that. Well, with all that evidence that wasn't in the record in 1970 and isn't considered under the Pew test, how could it be that the Board of Veterans' Court was wrong in saying that this was not an act of indeterminative error? But doesn't it puzzle you that they now acknowledge he had this problem back in 1970, which he had to have in order for it to be given any percentage of benefit. He now gets 20% benefit. But for some reason they say, well, no, it really didn't begin in 1970. It suddenly began in, what, 2010 or whenever it is. Does that make good sense? What's wrong with that picture? Well, first of all, the RO in 2004 didn't conclude that he has spondylosis. He simply said that given the benefit of the doubt rule, given the medical opinion of Dr. Nance, put it all together, the evidence is in equal place, and we're going to say he does. But to say that additional evidence, he gets it going forward, doesn't mean it was clear and unmistakable error, i.e. an outcome-determinative error, that occurred in 30-something years earlier. I see that my time is up, and unless the Court has any further questions, we would ask that the Court affirm the decision of the Veterans Court that there was no Q in the 1970 RO decision. Thank you. Thank you, Mr. Austin. Mr. O'Connell has a couple of minutes for rebuttal. Thank you. We do not have a problem with the high standards that Q imposes. We do not have a problem with the outcome-determinative test. Your Honor, you have jurisdiction to- Then what is your problem, sir? My problem is that they're using a rule that we can't consider opinion evidence, the sort of evidence that was general medical knowledge at the time of 1970. We happen to have a doctor now who's saying it, as your questions went to, and we think that that should be considered. The same court who decided that we can't consider Dr. Nairn's affidavit also says, where's the, quote, objective clinical evidence on the basis of that diagnosis that was made in 1970? Again, what are they going to do with an X-ray film? I would submit that we're probably going to need a doctor today to tell you what those mean. That's all we want to do when we have to hear from Dr. Nairn. Three, ruling that all evidence must not be supported is not the standard. That's merely one type of error that might occur. If you look at the Bouton case and you look at the Russell cases, there was evidence that was neutral. In Bouton, there was even evidence that was negative. In this case, X-rays that don't happen to show spondylolisis, which is just a stress fracture, is not negative evidence of spondylolisis, but the court wasn't allowed to have an informed opinion of what these diagnoses actually mean. If there's no other questions, I'd like to thank you and ask respectfully that you remand, with further instructions, and give some indication of what rules the court should use. Thank you, Mr. O'Connell. The case is submitted. Thank you.